Filed 8/13/26  Marriage of Wang and Hsu CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of ANGEL XIAO-PING WANG and CHARLES HONGKUANG HSU. | B340762 |
| ANGEL XIAO-PING WANG, | Los Angeles County Super. Ct. No. GD060160 |
| Plaintiff and Respondent, | |
| v. | |
| CHARLES HONGKUANG HSU, | |
| Defendant; | |
| CARITAS CHRISTIAN CHURCH, | |
| Claimant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dean Hansell, Judge.  Affirmed and remanded with directions.

Nonprofit Legal Services and Adam Dolce for Claimant and Appellant.

Law Offices of Edward C. Ip & Associates, Edward C. Ip and Jenny Zhao for Plaintiff and Respondent.

─────────────

Caritas Christian Church (Caritas) appeals from a judgment entered against it for fraudulent misrepresentation after a bench trial on Angel Xiao-Ping Wang's first amended complaint in joinder.  Wang filed the joinder complaint against Caritas, its pastors—known as James Yang and Michael Ma—and one of its officers, Yang's wife Shinemay Yang, in her divorce action from her then-husband Charles Hongkuang Hsu.[1]  She alleged Caritas made false representations to her to induce her to transfer her home—in which Hsu had claimed a community property interest—to Caritas as a donation.[2]

Caritas contends Wang lacked standing to maintain her action against it, substantial evidence did not support the judgment, the trial court made findings beyond the issues framed by the pleadings, the trial court's credibility finding as to Wang was arbitrary and unreasonable, and the judgment granted Wang relief contrary to law.  We affirm the judgment but remand the matter for the trial court to determine whether the judgment should be modified to include any payment from Wang to Caritas.

─────────────

[1]     Wang also sued, but later dismissed, the Yangs' son Abraham Yang.  To avoid confusion we refer to Shinemay and Abraham by their first names.

[2]     After Wang filed the joinder complaint, Caritas moved to disqualify her attorney.  We affirmed the trial court's denial of that motion in an unpublished opinion, *In re Marriage of Xiao-Ping Wang and Hongkuang Hsu* (B291530, Oct. 16, 2019) [nonpub. opn.] (*Caritas I*).

**FACTS AND PROCEDURAL BACKGROUND**

Consistent with our standard of review, we state the facts in the light most favorable to the trial court's factual findings set forth in its statement of decision, resolving any conflict in the evidence and drawing all reasonable inferences from the evidence in support of the trial court's decision.[3] (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)

**1.** ***Initiation of divorce and real property transfer***

Wang and Hsu married in March 2002. Wang filed a petition for dissolution against Hsu in August 2016 after obtaining a temporary restraining order (TRO) against him for a domestic violence incident. On September 13, 2016, Hsu filed a response to the petition, claiming a community property interest in real property located in Temple City (the Property), and on September 20 recorded a Notice of Pendency of Action (lis pendens) on the Property. The summons issued with the petition also automatically, temporarily restrained the parties from transferring property without written consent of the other party (ATRO).

Wang owned the Property before her marriage to Hsu, but mortgage payments and capital improvements were made with community property funds during the marriage. In November 2002, Hsu quitclaimed his interest in the Property to Wang.

In February 2016, about seven months before she filed for divorce, Wang transferred half of the Property to her daughter

---

[3]     Where appropriate we describe the facts as the trial court did, and as the parties did in their joint statement of facts accepted by the trial court. We also take some initial background facts from *Caritas I*. We reserve discussion of some testimony for our analysis.

Jade Xu, as joint tenants. The Property had two houses—a front and a back. Wang lived in the back house, and Jade lived in the front house. They ran a daycare facility out of the front house. Until mid-November 2016, Xu paid for the expenses on the Property, including the mortgage and taxes.

Wang was granted a one-year restraining order against Hsu in September 2016. She then "sought help and guidance" from Yang and his wife and began to attend church services at Caritas, where Yang and Ma were the pastors. Wang had known Yang and his wife since 1989. He officiated at her marriage to Hsu. Wang joined Caritas at the end of 2016 at the invitation of Caritas's pastors—Yang and Ma. She said she joined because Yang was there, and he had come to see her. She relied on Yang for guidance and advice.

Wang had belonged to at least two other churches where Yang preached—one from 2003 to 2006 and another from 2007 to 2014. Wang followed him as he moved from church to church. While at one of the other churches, Yang asked Wang about donating the Property to that church. Wang spoke to her husband about it, but he rejected the idea. During their marriage, Wang and Hsu had used the Property "for church service." After Wang joined Caritas, she and Yang "revisited" Wang's "previous intent" to donate the Property to the church. Wang agreed.

At some point after September 20, 2016, Wang told Caritas there was a lis pendens on the Property. Yang told Wang the lis pendens didn't affect her donation. He "believed Caritas could still receive the donation of the Property."

Around November 16, 2016, Stephen J. Thomas of the Thomas Business Law Group, P.C. (Thomas firm) wrote to Ma

4

about issues regarding the donation of the Property to Caritas. (Ma was Thomas's former client.) The Thomas firm prepared a contract for the donation, entitled, " 'Agreement to Donate Real Property.' " On November 17, 2016, Ma, Yang, and Shinemay went to the Property and gave Wang and Xu English and Chinese versions of the donation agreement. Wang and Xu signed both versions of the agreement, although Wang did not read English and Xu did not read Chinese. Yang, as the "Chief Pastor," and Ma, as the "Witnessing Pastor," signed both versions for Caritas. Under the agreement, Wang and Xu agreed to donate the Property to Caritas, and it agreed to "assume payment of the mortgage loan," pay the property taxes, and pay Wang's "costs of living until the day she meets the Lord." Before the donation agreement was executed, Yang, Ma, and/or Shinemay orally committed to Wang that she and Xu could continue to live on the Property rent free until Wang's death, and it would pay her living expenses and costs associated with her dissolution proceeding.

On December 9, 2016, Wang—accompanied by Yang and Ma—executed a quitclaim deed transferring her interest in the Property to Caritas as a "[b]onafide gift." Xu executed the quitclaim deed separately that same day, outside of Wang's presence. In 2017, the church began paying the Property's expenses, such as the mortgages, property taxes, and utilities.

## 2.     *Post-transfer events*

On January 9, 2017, during a hearing in the dissolution case, Hsu's then-counsel disclosed he had learned Wang had donated the Property to Caritas without Hsu's knowledge or consent. (Accordingly, the transfer violated the ATRO.)

5

Thomas represented Wang at the hearing.[4] Counsel mentioned Wang and her husband had discussed giving the Property to their church in exchange for their being allowed to live there. Counsel explained to the court, "the quitclaim was done to [Caritas] in December[,] and it was done about two days after I was hired, and I was not consulted about it." The court expressed concern about the transaction, describing it as "seriously problematic." Wang told the court, "This donation was set 14 years ago. . . . [¶] . . . He proposed such donation." The court ordered Wang to pay Hsu temporary spousal support of $1,611 per month, based in part on Caritas's support payments to Wang, subject to any future motions for modification.

Two days later, on January 11, Hsu's counsel advised Ma and Caritas in writing that Wang had violated the ATRO and to " 'hold off' making any changes to the [P]roperty . . . without an express order from the family law court." Caritas paid Hsu the $1,611 court-ordered monthly spousal support from January through May 2017.

The Thomas firm stopped working on Wang's case in March 2017 and moved to be relieved as counsel in May 2017 for nonpayment of fees. Caritas had stopped paying the firm's fees in January 2017.

In the meantime, Shinemay gave Wang and Xu a rental agreement dated December 15, 2016—a week after they signed

---

4      Ma referred Wang to the Thomas firm in anticipation of the January 2017 hearing. Caritas paid the attorney's fee.

the quitclaim deed.[5]  Caritas also had Xu move out of the front house and into the back house with Wang, so it could rent out the front house.[6]  Xu paid Caritas $1,000 a month in rent on the Property in 2017 for six months, for a total of $6,000.  She stopped paying rent after she learned Caritas had stopped paying the mortgage and other expenses in July 2017.  She resumed paying the expenses on the Property from September 2017 onward, although Caritas paid some expenses in September.

On May 17, 2017, Yang personally signed a letter of intent to borrow $720,000, using the Property as collateral.  He and Ma said the loan's purpose was to refinance the existing mortgage on the Property.  The refinancing never happened, however. (The trial court found the letter of intent suspect.  Not only was Yang listed as the borrower, but the existing mortgages on the Property totaled only about $325,000.  The terms of the loan also were less favorable at 8.5 to 9.25 percent interest with a 4.5 point origination fee.)  On June 6, 2017, Wang's current counsel emailed Yang and advised him to stop the loan application and that he and Caritas should take no further action on the Property.

Caritas then prepared an affidavit, dated July 12, 2017, for Wang and Xu to sign.  The affidavit purported to be a statement from Wang that she and Xu had entered into the donation agreement freely, understood Caritas wanted to sell

---

[5]  The agreement listed Wang as the "lessor" but Caritas— through Shinemay—signed the agreement as lessor.  Wang did not.

[6]  In February 2017, Caritas moved tenants into the front house who paid rent of $1,500 a month to the church.

7

the Property, and had no objection to its sale. Wang and Xu refused to sign it. Also in July, Caritas—through one of its members—approached Hsu about settling the dissolution action. Caritas did not tell Wang about the proposal. The proposed settlement—signed by Yang—stated Caritas would pay Hsu $100,000 to settle the matter, including Hsu's release of any court orders on the Property.[7]

On August 3, 2017, Wang, through counsel, filed her own lis pendens on the Property. On August 11, 2017, without informing Wang, Yang—on behalf of Caritas—quitclaimed the front house of the Property to his son Abraham.[8]

Wang filed her joinder complaint on August 14, 2017, and a verified first amended joinder complaint on September 28, 2017, seeking to undo the donation of the Property to Caritas. Wang alleged (in the only operative cause of action) Caritas, Yang, Shinemay, and Ma (collectively, claimants) engaged in

---

[7]    Ma and another church member had approached Wang about settling the case. On July 17 and 18, Wang's attorney exchanged emails with Yang about the proposed settlement and Caritas having approached Hsu. On July 19, she asked for additional documents to evaluate the proposal. Another email exchange ensued between them in August 2017 when Wang's attorney attempted to arrange a meeting with Caritas's representatives, Hsu, and Wang to discuss the proposed settlement. After Yang did not provide the documents, and Caritas contacted Wang without involving her attorney, on August 17, 2017, Wang's attorney emailed Yang to tell him the matter would move forward.

[8]    Abraham divested his interest in the Property as part of a stipulation with Wang.

8

intentional misrepresentation. She alleged they misrepresented to her that they had consulted an attorney who had advised them that Wang could "freely transfer" the Property while the divorce proceeding was pending; "Caritas could take care of [Wang's] living expenses"; "if there was any problem," Caritas could deed the Property back to her "without question"; and, after Wang and Xu executed the quitclaim deed, Caritas "would pay for all [Wang's] expenses associated with her pending dissolution" and she could manage and live at the Property until she died. Caritas, however, did not have sufficient assets to pay for Wang's expenses and intended to use the Property "as collateral to borrow a substantial amount of money or sell the . . . Property to finance Caritas'[s] other business engagement."

On September 13, 2017, after Xu stopped paying rent, Caritas—through Shinemay—issued a 60-day notice to terminate tenancy in an attempt to evict Wang and Xu from the Property. Shinemay agreed Caritas had promised Wang she could live on the Property for free but said "the circumstances changed." The court granted Wang's application for a TRO—and then a "preliminary restraining order"—restraining Caritas from selling the Property or evicting the tenants.

On December 26, 2018, Hsu—self-represented at the time—added a breach of fiduciary duty claim to his response in the dissolution case for Wang having transferred the Property to Caritas. On September 17, 2021, the family court entered its final judgment of dissolution based on the parties' stipulation. Hsu waived any claim against Wang for having violated the ATRO. Wang agreed to pay Hsu $150,000 as his share of the community's contribution to the Property if she prevailed in

9

invalidating the transfer of the Property to Caritas in this joinder action.

### 3. *Trial and statement of decision*

The bench trial on Wang's claim for intentional misrepresentation took place on January 8–12 and March 26–29, 2024. Wang, Xu, Shinemay, Yang, Ma, Hsu, Abraham, former church member and officer Vivian Zhang, and notary—and friend of Wang—Elina Teh testified.

The court found Wang and Xu to be credible. The court noted Wang "was very specific in her answers, consistent, did not go out on a limb and her testimony tracked the exhibits admitted into evidence." She testified in Mandarin. The court noted Xu "never went out on a limb with her testimony, confining it to what she personally experienced, and most of her testimony tracked the testimony of her mother." The court noted Xu had a separate, pending lawsuit against claimants but found its existence had not "in any way compromised her veracity or the integrity of her answers."

In contrast, the court "did not always find" Shinemay, Yang, or Ma credible, noting they contradicted themselves, the documentary evidence sometimes contradicted their testimony, Shinemay's and Yang's testimony sometimes "lacked grounding in logic," and Ma and Yang were "evasive." The court found Hsu's testimony "to be too limited to make a credibility determination although his hostility to all parties was palpable." The court found "his short testimony to be inconsequential to any issue in these proceedings."

On April 9, the court issued its tentative decision and proposed statement of decision. On April 18, claimants filed a request for statement of decision as to eight additional issues.

On April 19, Wang identified 12 inaccuracies in the proposed statement of decision. On April 23, claimants filed objections to the proposed statement of decision. On May 1, the court issued its 50-page decision and statement of decision in which it addressed the identified issues and objections and corrected the noted inaccuracies. The decision spends 24 pages discussing the court's factual analysis based on the testimony and exhibits admitted at trial.

The court found claimants made representations to Wang "that were not true. They represented that if she agreed to sign over the home, inter alia, they would: [¶] 1) Let [Wang] and [Xu] live in the house rent free for the rest of her life. [¶] 2) Her living expenses would be paid for by the Church for the rest of her life. [¶] 3) The mortgages on the house and the expenses of maintaining the house would be paid for by the Church. [¶] 4) Her dissolution legal costs and other costs (such as spousal support) would be paid for by the Church." The court also found that, when claimants "made these representations," the church "had no money, no assets, and no income . . . . These are disclosures that the [church] should have made to [Wang] but did not do so. After only a few months, the Church breached its promises. Also, within a week of the quitclaim deed being signed, [Wang] and [Xu] were directed to pay rent based on the Church's dire finances."

The court ordered the November 17, 2016 agreement and December 9, 2016 quitclaim deed invalid and void as to Wang. On June 28, 2024, the court entered judgment in Wang's favor. Only Caritas appealed.

11

## DISCUSSION

### 1. *Standard of review*

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Substantial evidence constitutes "evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 507.) As the reviewing court, we do not "reweigh evidence and are bound by the trial court's credibility determinations." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) We presume the record contains substantial evidence to support the court's orders, and the appellant has the burden to demonstrate that it does not. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)

The testimony of one witness, even if uncorroborated, may constitute substantial evidence, unless the testimony is inherently unreliable. (*Newman v. Casey* (2024) 99 Cal.App.5th 359, 375; *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1407.)

### 2. *Standing*

Caritas contends Wang lacked standing to cancel the quitclaim deed due to fraud because she made a judicial admission that she would have donated the Property to Caritas despite the fraud. Caritas argues Wang thus "could not

12

reasonably claim serious injury under Civil Code § 3412 when, by the time of trial, she was no longer culpable to Hsu" based on their divorce settlement.[9]

Civil Code section 3412 states, "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled."  " 'To prevail on a claim to cancel an instrument, a plaintiff must prove (1) the instrument is void or voidable due to, for example, fraud, and (2) there is a reasonable apprehension of serious injury including pecuniary loss or the prejudicial alteration of one's position.' " (*Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1193–1194.)

"The admission of fact in a pleading is a 'judicial admission.' " (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271 (*Valerio*).)  A judicial admission " 'is a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues.' " (*Ibid.*)  " 'Under the doctrine of 'conclusiveness of pleadings,' a pleader is bound by well pleaded material allegations or by failure to deny well pleaded material allegations.' " (*Ibid.*) "[N]ot every factual allegation in a complaint automatically constitutes a judicial admission," however.  (*Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452 (*Barsegian*).)  Rather, "if a factual allegation is treated as a judicial admission, then

---

9       Wang agreed to pay Hsu $150,000 if she prevailed in the joinder action to undo the transfer of the Property, essentially in exchange for his waiver of any claims against Wang for having violated the ATRO and for his community interest in the Property.

13

neither party may attempt to contradict it—the admitted fact is effectively conceded *by both sides*." (*Ibid.*)

The "judicial admission" Caritas refers to is paragraph 41 of Wang's joinder complaint. Wang alleged Caritas misrepresented "that she could freely transfer the . . . Property to Caritas and that [Hsu] consented to such transfer." When Wang "discovered" Hsu had not agreed to the transfer, the transfer "was in violation of the [ATRO], and *may* constitute [a] fraudulent transfer during the pendency of a legal proceeding, she requested [claimants] to return the . . . Property to her during the resolution of the pending divorce. [She] proposed to repay any funds Caritas expended and to donate the . . . Property back to Caritas after the completion of the divorce action. [Claimants] refused." (Italics added.)

In its verified answer, Caritas denied the allegations in paragraph 41. Accordingly, Wang's alleged rejected proposal does not qualify as a judicial admission. (See *Barsegian, supra*, 215 Cal.App.4th at p. 452 ["[A] judicial admission is ordinarily *a factual allegation by one party that is admitted by the opposing party*. The factual allegation is removed from the issues in the litigation because the parties *agree* as to its truth."]; *In re Marriage of Starr* (2026) 118 Cal.App.5th 52, 62 [same].) In any event, the trial court found Wang's allegation in paragraph 41 of the joinder complaint "was nothing more than a *proposal . . .* directed to the Claimants." (Italics added.) The court explained, "[Wang] proposed a certain outcome with the subject property (if they gave her the property back she would donate it back after the divorce proceeding was over), which the Claimants rejected. It was a conditional proposal which would have required the

14

Claimants to donate the subject property back to [Wang] that the Claimants rejected, not a judicial admission."

We agree with the trial court. Wang's proposal to donate the Property back to Caritas if it returned the Property to her was not an admission that she lacked injury from Caritas having fraudulently induced her to donate the Property to the church in the first place. Caritas's proposed interpretation of the rejected proposal fails to consider that Wang would not have had to make such a proposal had Caritas not misrepresented that the timing of the transfer was permissible. In other words, Wang's rejected proposal is not a well-pleaded statement that she intended to give Caritas the Property despite its misrepresentations to her. Indeed, a trier of fact could interpret the proposal to donate back the property later as Wang's desperate attempt to avoid potentially being held to have made a fraudulent transfer in her divorce case.

Caritas's reliance on *Valerio* is inapt. There, a contractor challenged a judgment finding no contract existed between it and its subcontractor. (*Valerio, supra*, 103 Cal.App.4th at p. 1266.) The appellate court reversed the judgment and remanded for a new trial, agreeing the trial court had "failed to give conclusive effect to [the subcontractor's] judicial admissions regarding the existence of a written contract." (*Id.* at pp. 1267, 1274.) In his answer to the contractor's cross-complaint, the subcontractor admitted the contractor had entered into a written contract with him that he had signed. (*Id.* at pp. 1267–1268.) That judicial admission "had the effect of establishing the truth of the existence of the written contract." (*Id.* at p. 1271.)

Wang's rejected proposal, in contrast, was not an affirmative statement of intent to donate the Property to Caritas

15

even if everything it had represented to her were untrue. Accordingly, Wang was not "prohibited from presenting evidence that she would not have donated the . . . Property to Caritas but for their fraud," as Caritas argues. The trial court found Wang's testimony—that she was induced to transfer the Property to Caritas by their misrepresentations—credible. And, as the court also found, Wang presented evidence she was injured due to Caritas's fraud: Caritas got the Property but did not honor its financial commitments to her. Exhibits admitted in evidence show the taxes on the Property more than doubled due to the transfer—further evidence Wang was harmed by quitclaiming the Property to Caritas and thus had standing to pursue her fraud cause of action to invalidate the quitclaim deed.[10]

### 3. *Wang's offer to repay*

Caritas seems to contend that, even if we were to affirm the trial court's fraud findings, we must reverse the judgment invalidating the quitclaim deed because Wang did not prove she restored or offered to restore the payments Caritas made on her behalf. Caritas relies on *Clint v. Eureka Crude Oil Co.* (1906) 3 Cal.App. 463 (*Clint*). It is distinguishable. First, the reviewing court there affirmed a judgment entered in favor of the defendant on plaintiffs' action to cancel a deed alleged to

---

[10] In response to Caritas's objection that it was entitled to funds it had paid on Wang's behalf, the court stated, "This issue and the related issue of damages resulting to [Wang] from the Claimants' fraudulent conduct were not addressed at trial." The court noted Caritas "materially benefitted from the Claimants' fraudulent conduct in receiving rent from the property both from third parties and from Jade Xu on behalf of [her] and her mother and inducing [Wang] to sign over her life savings to the Church."

16

have been obtained through fraudulent misrepresentations. (*Id.* at p. 464.) Second, the defendant had transferred shares of stock to the plaintiffs that the court held was sufficient consideration for the conveyance of the deed. (*Id.* at pp. 464–465.) There was no evidence the plaintiffs "ever offered to return any portion of the stock received . . ., and the court f[ound] that no such offer was made." (*Id.* at p. 465.) Explaining "it would be inequitable to cancel this deed without a return of the stock which was given for it, even if the deed was obtained by fraud," the court found it "unnecessary to determine anything as to the question of fraud . . . as immaterial to the support of the judgment." (*Ibid.* ["This is an action in equity and the plaintiffs cannot be restored to their rights in the property and at the same time retain the consideration for it, which they have received."].)

Here, in contrast, the trial court found Caritas failed to and could not fulfill its financial obligations to Wang that it promised in exchange for the transfer of the Property. In other words, it did not give sufficient consideration for the deed. Again, Wang alleged she offered "to repay any funds Caritas expended" if it would return the Property to her but Caritas refused. Caritas contends Wang's allegation was insufficient. On the one hand, Caritas contends the allegation was a judicial admission but, on the other hand, it contends the allegation was insufficient to show Wang offered to repay what Caritas spent on her behalf. Caritas can't have it both ways.[11] In any event, nothing in *Clint* suggests the plaintiff even alleged having offered to return the stock to defendant. Indeed, from what we can glean from

---

[11] Caritas's attorney read paragraph 41 of the joinder complaint to Wang during the trial.

17

the opinion, the plaintiffs there contended the stock was consideration for an earlier lease agreement for the property, but a second lot of stock was owed for the conveyance of the entire title. (*Clint, supra*, 3 Cal.App. at p. 464.) In other words, the plaintiffs' position seems to have been that it was entitled to the stock *and* cancellation of the deed.

Accordingly, we reject Caritas's contention that the court could not enter judgment in favor of Wang because she did not state at trial that she offered to repay Caritas. Moreover, Caritas wasn't automatically entitled to the return of the payments it made on Wang's behalf. We address its related contention that the judgment must be modified to that effect below. (See *Fleming v. Kagan* (1961) 189 Cal.App.2d 791, 797 (*Fleming*) [" '[I]n an action to cancel an instrument, where the defendant shows expenditures or part performance *under an agreement underlying such instrument*, the defendant is entitled to reimbursement for such expenditures or for the reasonable value of the benefits conferred by part performance, *deducting therefrom any damages* actually suffered by reason of default.' " (first italics in original, second italics added)].)

### 4.    *The court's credibility findings were not arbitrary or unreasonable*

"[N]either conflicts in the evidence nor ' "testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' [Citations.] Testimony may be rejected only when it is inherently improbable or incredible, i.e., ' "unbelievable *per se*," ' physically impossible or

18

' "wholly unacceptable to reasonable minds." ' " (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.)

Caritas contends the trial court arbitrarily and unreasonably found Wang credible, arguing she was impeached by prior testimony and the allegations in her verified joinder complaint. We reject that contention. Although there were differences between some of Wang's earlier testimony, the joinder complaint, or stipulated facts, and her trial testimony, those differences weren't actual contradictions. For example, Caritas makes much of the fact Wang testified it was Yang's idea that she donate her property but at her deposition she "confirmed she wanted to donate the Property." Wang was asked if she wanted to donate the Property when she signed the donation agreement. She said that " '[a]t the time' " she did. That testimony did not contradict her trial testimony that it was Yang's idea that she donate the Property to Caritas. The court reasonably could find Yang brought the idea of donation up to Wang and she agreed, wanting to help the church.

Caritas also notes Wang's statement at the January 2017 hearing that the donation of the Property "was set 14 years ago," and "[h]e proposed such donation." Wang—who speaks Mandarin —testified at trial with an interpreter and said an interpreter had been assisting her at the January 9 hearing.[12] Wang

---

[12] Caritas argues Wang's offering of answers in English at that hearing "cast[s] doubt on her representation that she could not understand English." We reject this contention. Wang testified throughout the trial in Mandarin. The court found she couldn't read or write in English, except to recognize her name, address, and numbers. Moreover, Wang testified she "wasn't clear" on what Thomas meant at the January 2017 hearing because she "couldn't speak English well." At her deposition

explained at trial what she "wanted to say at the time was that 14 years ago . . . Pastor Yang asked us about it," but after discussing it with her then-husband Hsu, they "didn't agree to do so." In any event, her statement certainly was not an admission that she and/or Hsu intended to donate the Property to Caritas or even that they had a clear intent to hand over the Property to their then-current church.

Wang also testified Yang first suggested she and Hsu donate the Property back in 2002 to 2003 or 2004, but after discussing it, they decided against it. The joinder complaint made a similar allegation—on information and belief—that in 2004 she and Hsu used the Property "for church service and considered donating to their service church" but Hsu changed his mind.[13] Caritas contends Wang judicially admitted she

---

she similarly testified, " 'I don't understand what they're talking about. I don't know the English.' " She consistently testified that, when she went to Thomas's office in December 2016—with Ma and Shinemay—she was unable to communicate with Thomas directly. They had to "converse" through his assistant who spoke Chinese. He would ask a question and the assistant would "tell [Wang] about it."

[13] On June 5, 2018, in opposition to Caritas's motion to disqualify her counsel, Wang similarly declared she and Hsu "had intent to donate [the] Property (not Caritas) to church for service in 2004. While I was attending service at Caritas, Pastor . . . Yang . . . talked with me about my previous intention to donate [the] Property." The parties' joint statement of facts similarly included the fact: "During [Wang's] attendance of church service at Caritas Church, Yang and [Wang] revisited [Wang's] previous intent of donation of the . . . Property." Again, the "previous" intention was first suggested by Yang.

20

always intended to donate the Property. Neither the complaint nor Wang's declaration—or the parties' agreed facts— stated Wang and/or Hsu came up with the idea of donation independently or that their intent those many years ago was to hand over the Property—as opposed to making a testamentary donation. For example, Xu—whom the court also found credible —testified Wang mentioned years earlier that "when she died, she intended to give her home to God." Hsu also had declared— in August 2022—that early in their marriage, he and Wang "had talked about donating the . . . Property to church upon death . . ., but we never took any action to effectuate such an intent, such as putting it in a will." Moreover, as the trial court found, the allegation in the joinder complaint described Wang's and Hsu's "intention as nothing more than a *possible* donation." (Italics added.)

Caritas also notes that, in her request for the TRO, Wang declared she transferred the Property in reliance on "the representation an attorney had 'OK'd' the transfer," but at trial, "after judicially admitting an attorney had assisted in the preparation of the Donation Agreement . . ., Wang's reliance shifted to Caritas's finances." Caritas mischaracterizes Wang's testimony and the facts. In her declaration, Wang stated, "I transferred the Property to Caritas in reliance on the misrepresentation by Caritas . . . that an attorney told them it is OK for me to freely transfer the Property to Caritas." The parties' joint statement of facts agreed the Thomas firm "prepared a contract for the donation." That stipulation, however, did not say that the Thomas firm or Thomas himself approved of the timing of the Property transfer or told Caritas that Wang could transfer the Property while her divorce

21

proceeding remained pending.[14]  Nor did that fact state an attorney "assisted" Caritas in drafting *the terms* of the donation agreement.  Indeed, Ma testified to the contrary.  Ma clarified the Thomas firm translated into English the Chinese donation agreement Ma had given to Thomas.  Ma agreed Thomas did not draft the terms of the donation agreement.  Ma testified he gave the Chinese draft of the agreement to Thomas on November 16, 2016, and asked the firm to translate it into English and to put the Chinese draft, and the English translation, on the firm's letterhead.  He paid the Thomas firm $500 for the translation service.

We also reject Caritas's implication that Wang changed her position as to what representations she had relied on when she agreed to transfer the Property to Caritas.  Wang's evidence showing Caritas knew it couldn't fulfill its financial promises didn't negate her reliance on Yang's and Ma's representations that an attorney agreed Wang could transfer the Property.  Nor did Wang not having mentioned Caritas's financial promises in her request for the TRO signify she hadn't relied on those promises when she signed the donation agreement.  After all, Wang's joinder complaint always had alleged Caritas made misrepresentations or/false promises in both areas, and the

---

[14]    And, as the court found, Caritas presented no evidence that Thomas—a commercial law attorney—"was qualified to provide [such] legal advice (which would be obviously wrong) since the home transfer clearly violated" the ATRO.  That lack of evidence also supported the court's finding that Caritas recklessly disregarded the truth of its representation that Thomas had drafted and approved the donation agreement.

request for a TRO did not require a full explication of Wang's fraud claim.

Nor did Wang focus only on Caritas's finances at trial. She also introduced evidence about Caritas's representation that an attorney approved the transfer. Wang called Ma in her direct case, and Wang testified Yang and Ma told her the agreement "was drafted by attorney Thomas," and he had said she could sign the document because it had "been reviewed and everything was fine," and there were "no laws that would prevent [the] document from being executed" or Wang "from donating."[15]

Caritas also argues Wang's lack of credibility is evident from the "impeach[ment]" by trial exhibts of her joinder complaint's allegation about the church's lack of nonprofit status. Wang made that allegation on information and belief. Moreover, she testified Ma—when she asked for a tax receipt—told her the church hadn't been approved as a nonprofit. That Caritas's tax returns—presumably produced in discovery *after* Wang filed her joinder complaint—stated it was a nonprofit does not compel a finding that Wang lied. Caritas similarly contends Wang could not be found credible because she alleged Caritas told Vivian Zhang—who delivered the $100,000 settlement proposal to Hsu—that Wang's attorney had prepared the document when "at trial it became clear no such fabrication occurred." Again, Wang made that allegation on information and belief. That the

---

[15] Ma also testified—at his 2019 deposition read at trial—that Thomas opined the lis pendens was " 'very, very troublesome, and he suggested for us not to take the donation.' " That admission further bolsters the court's finding that Caritas misrepresented to Wang that an attorney approved the transfer.

23

evidence elicited at trial showed otherwise did not render Wang's trial testimony inherently improbable.[16]

**5.** ***The record did not require the court to find Wang ratified the donation agreement or waived her right to rescind it and the deed***

Caritas argues the judgment in favor of Wang was improper as a matter of law because she accepted the benefits of the donation agreement for six months after discovering Caritas's " 'fraud.' " (Citing *Neet v. Holmes* (1944) 25 Cal.2d 447, 458 (*Neet*) ["Waiver of a right to rescind will be presumed against a party who, having full knowledge of the circumstances which would warrant him in rescinding, nevertheless accepts and retains benefits accruing to him under the contract."]; Civ. Code, §§ 1588, 1589 [contract voidable for lack of consent "may be ratified by a subsequent consent"; "voluntary acceptance of the benefit of a transaction is equivalent to" consent].) Caritas also contends the court erred in not considering its affirmative defense of waiver.

Caritas contends the trial court "dated the misrepresentations or concealments as being discovered by Wang almost immediately after she had transferred the Property to Caritas" in either December 2016 or January 2017, yet she accepted thousands of dollars of payments by Caritas on her behalf beginning in January 2017. We disagree with Caritas's characterization of the court's findings.

The evidence showed that, after title to the Property transferred to Caritas, it paid the mortgages on the Property for

---

[16]     Zhang testified she merely delivered the document to Hsu. No one told her Wang's attorney prepared it, and she didn't know its contents.

24

about six months, paid for other Property-related expenses, made spousal support payments to Hsu for about five months, made some payments to Thomas for his representation of Wang in the divorce proceedings, and paid a consultation fee to Wang's current attorney and a retainer fee (as a loan). But Wang accepted these payments believing the Property's transfer was proper and without knowledge that Caritas neither had the ability to pay for her living expenses nor intended to let her live on the Property until her death.[17] Moreover, having accepted the Property and Wang's savings, Caritas essentially had put Wang in a position where her only choice was to accept those payments.

Although the court found Caritas immediately acted contrary to its agreement, the court did not make a finding that Wang immediately believed she had been defrauded. Nor did the record require the court to make such a finding. The court found Wang's testimony credible, including that she trusted Yang and Ma and the church. Again, the court's crediting of Wang's testimony was not unreasonable. Caritas argues its demand for rent due to the church's financial difficulties less than a week after the quitclaim deed was signed "should have triggered alarm bells" and prompted Wang and Xu to seek "an immediate explanation and/or recission of their property transfer." But Wang testified Shinemay told her the situation was "temporary." Wang had known Yang and Shinemay for years. Yang had officiated at her wedding. She considered Yang to be her

---

[17] The court found claimants "had confidential plans 'bit by bit' to ease [Wang] and [Xu] off the [P]roperty altogether and into a single room somewhere so they could take over the entire property."

"spiritual leader" who introduced her to Christ. "[W]ith anything[, she] would go to him," and they would pray together. The court reasonably concluded Wang trusted and believed Yang and Shinemay.

Caritas also contends Wang knew attorney Thomas didn't create the donation agreement after the hearing on January 9, 2017, and thus was aware of any alleged fraud at that time. Wang agreed with Caritas's attorney that the "first time" she was "led to believe . . . Thomas was not involved with the donation" was at the January 9 hearing. She clarified, however, that she was led to believe that because the interpreter assisting her at the hearing told her Thomas said "he didn't know." Wang didn't know if Thomas meant he "didn't know about the donation or the deed" because she "couldn't speak English well," and the interpreter "just told [her] he didn't know." Counsel read from Wang's deposition where he asked her, " 'When did you learn that this document [the donation agreement] wasn't created by Stephen Thomas?' " Wang answered, " 'It was on January 9, 2017, the first time I was in court.' " Wang further responded, " 'At the time I suspected.' " After reading the deposition, Caritas's attorney asked Wang, "On January 9, 2017, that was when you believed attorney Thomas didn't create the donation agreement, correct?" Wang responded, "It's not that I thought— I think or not. They told me that—it's that he told me that he did not know." When asked if she spoke to Thomas after the hearing about his involvement in the donation agreement, Wang responded, "I don't speak English. I wouldn't be able to talk to him. I didn't talk with him." Moreover, Ma and/or Yang told her not to talk about what happened in court. In any event, Wang

testified that, after the January 2017 hearing, she still believed her donation to Caritas was proper.

We thus reject Caritas's contentions that the trial court's findings demonstrated Wang was aware of Caritas's misrepresentations "either on December 15, 2016, when they introduced to her a rental agreement under the banner of having financial difficulties; or when Wang believed the Donation Agreement was forged, on January 9, 2017." She trusted Caritas's representation that the need for her to pay rent was temporary. She also didn't affirmatively believe the donation agreement was forged but had an unconfirmed suspicion—because she couldn't communicate with Thomas—that an attorney may not have drafted the document. Again, Wang trusted her long-time spiritual advisor and the other claimants. Moreover, although Wang suspected Thomas was not involved in drafting the donation agreement, evidence showed she did not know Caritas did not intend to keep its promises to her until she learned of Yang's intent to take out what appeared to be a personal loan on the Property and his transfer of part of Caritas's interest in the Property to his son. After getting her attorney involved, and the attorney's unsuccessful attempts to discuss a resolution with claimants, Wang pressed forward with this case.

Accordingly, the record does not establish that Wang had "full knowledge of the circumstances which would warrant . . . rescinding" her agreement with Caritas so that she should have been found to have waived her right to rescind—or ratified—the agreement when she accepted payments Caritas purportedly made on her behalf. (*Neet, supra*, 25 Cal.2d at p. 458.) We thus need not determine whether the court erred in not considering

27

Caritas's affirmative defense of waiver, as any such error was harmless.

**6.** ***Substantial evidence supported the court's findings that Caritas—through Yang, Shinemay, and Ma—made actionable, intentional misrepresentations to Wang***

Caritas contends substantial evidence does not support the court's finding that the four representations it identified Caritas made to Wang constituted intentional misrepresentations.

"The elements of fraud that will give rise to a tort action for deceit are: ' "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.) " '[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.' " (*Ibid.*) " 'It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing h[er] conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing h[er] decision.' " (*Id.* at pp. 976–977.) A showing that a misrepresentation was material raises "a presumption, or at least an inference, of reliance." (*Id.* at p. 977.)

    a.    *Wang's and Xu's ability to live on the Property until Wang's death*

The court found claimants falsely represented that, if Wang "agreed to sign over" the Property, Caritas would let her and Xu

28

live there for the rest of Wang's life.  Caritas contends that, because the joinder complaint alleged claimants made that representation after Wang and Xu executed the quitclaim deed, Wang could not establish she justifiably relied on that representation because she already had "altered her legal relations to the Property prior to whatever life estate was promised to her."  (Citing *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1193 for the rule that "reliance is established 'when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction.' ")

The joinder complaint alleged, "After [Wang] and her daughter executed the quitclaim deed, [claimants] represented to [Wang] that Caritas would pay for all her expenses associated with her pending dissolution action and that [Wang] can manage the . . . Property and live there until the day she dies."  At trial Wang testified that, before she and Yang went to see an attorney named Liu—which was before she signed the donation agreement —"Yang told me that if you donate your house, we would be able to take care of everything for you."[18]  In explaining what Yang said about taking care of her, Wang testified he "said that even though the house would be donated, I could still be living in that house until I pass.  And the same goes to my daughter and my

_____

[18]     Wang asked attorney Liu about the divorce case, and Yang asked if "it was possible to donate and transfer the Property during that period."  Liu said the Property transfer could not be done while the divorce case was pending.

son-in-law that they would be able to continue to live in that property until the day they die." Xu corroborated Wang's testimony. On November 17, 2016, "the church people" came to the house, and Xu spoke to Yang, Ma, and Shinemay. Xu testified "[t]hey said that my mom could stay in the house until she died."

That testimony did not contradict the complaint. (See *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 850 ["under the doctrine of conclusiveness of pleadings evidence may not be received to contradict an admission on the pleadings"].) Both statements could be true—claimants could have told Wang she could live on the Property for the rest of her life to induce her to sign the donation agreement and quitclaim deed, and again made that representation to reassure her after she signed the quitclaim deed. In contrast, a written contract cannot at the same time exist and not exist. (Cf. *Valerio, supra*, 103 Cal.App.4th at pp. 1267–1268, 1271 [subcontractor's admission in answer that he and contractor had entered into a written contract established the truth of its existence].)

Critically, Caritas itself—through its officer Shinemay— admitted it told Wang *before* she signed the donation agreement or quitclaim deed that she would be able to live on the Property until she died. Shinemay confirmed that, before November 17, 2016, she told Wang that Caritas "would allow [her] to live at [the] Property for free for the rest of her life."[19]

---

[19] Shinemay's son Abraham—to whom Caritas had quitclaimed a share of its interest in the Property—testified he understood Wang was going to donate her house to the church,

Accordingly, Caritas could not have prejudicially relied on Wang's allegation that, after she signed the quitclaim deed, claimants told her she could live on the Property for the rest of her life when Caritas knew through its officer that it had made that representation before Wang signed anything. In any event, Caritas never argued to the trial court that the allegation in paragraph 26 of the joinder complaint was a judicial admission, much less that Wang was "prohibited from offering contrary evidence at trial." (*Valerio, supra*, 103 Cal.App.4th at pp. 1268–1269 [before trial contractor argued subcontractor was bound by its judicial admission of the existence of the written agreement and posttrial asked for a statement of decision on the issue].) Nor did its request for a statement of decision on "additional" issues ask the court to explain whether paragraph 26 of the joinder complaint constituted a judicial admission. Accordingly, it has forfeited any contention that the trial court could not rely on the above testimony.

> b. *Caritas's representation that it would pay Wang's living expenses for the rest of her life*

Caritas contends the trial court erred in finding Caritas misrepresented to Wang that "[h]er living expenses would be paid for by the Church for the rest of her life" because the representation was true at the time it was made or "concerned future events not otherwise subject to intentional misrepresentation."

The record shows Caritas—orally through claimants and in writing through the donation agreement—affirmatively

---

and "the church was going to take care of her," including by "allow[ing] her to live there until she passe[d] away."

31

represented it would pay for Wang's living expenses for the rest of her life if she donated the Property to it. As Caritas notes, that representation was a promise to perform. Citing *Tarmann v. State Farm Mut. Auto Ins. Co.* (1991) 2 Cal.App.4th 153, 158, Caritas also notes " 'broken promises of future conduct may, however, be actionable.' " " 'A false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact*. The allegation of a *promise* (which implies a representation of intention to perform) is the equivalent of the ordinary allegation of a representation of fact.' " (*Id.* at pp. 158–159.) In other words, "making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise." (*Id.* at p. 159 [declining to establish "negligent false promise" as "a new type of actionable deceit"].) The evidence showed Caritas did not intend to pay Wang's living expenses for life or at a minimum recklessly disregarded the truth of its stated intent.

Critically, Wang testified Caritas never paid her living expenses—she was to "get a monthly living expense[ ]" as part of the agreement.[20] Instead, it paid some expenses relating to the Property, such as the mortgages, utilities, and gardening

---

[20] Abraham also understood the church would "provide [Wang] with a living wage or . . . funds to live."

32

services.[21]  Caritas, of course, separately promised to pay the mortgage and costs associated with purchasing the property, including the taxes.  Indeed, it promised to "assume payment of the mortgage" but never put the mortgage in its name.  Moreover, the evidence showed Caritas—through Shinemay—immediately asked Wang to pay rent despite having promised she could live there rent-free until she died.  Xu paid six months of rent on behalf of her mother—and at her request—until Caritas stopped paying the mortgages.  Wang said they paid the rent to help the church through a "hard[ ] time" with the understanding it was temporary.  Caritas cannot be said to have paid the other expenses on the Property *for* Wang as promised, as it was charging her rent.  Indeed, although Caritas represented it needed Wang to pay rent only temporarily, it then tried to evict her and Xu when they stopped paying rent.

Caritas made some spousal support payments on Wang's behalf and paid some of her attorney fees.  But it stopped the spousal support payments and didn't pay all of attorney Thomas's fees, who withdrew as Wang's counsel.[22]  Wang testified Yang had told her that, in addition to "providing me a monthly living expense," Caritas "would locate an attorney . . . to assist me through my divorce litigation" and "pay for [any] spousal support."  In other words, Caritas separately promised to

---

[21]    Caritas paid those Property expenses from the beginning of 2017 until, for some expenses, September 2017.  It paid the mortgages for six months.

[22]    The $5,000 retainer check Caritas paid to Wang's current counsel included a note—written by Wang's attorney with her and Ma's consent—that the fee was a loan to Wang.

"take care of the divorce proceedings and any expenses incurred from the proceeding." Accordingly, we reject Caritas's contention the payments it made relating to the donated Property and to Wang's divorce proceedings demonstrated it had a present intent to perform its promise to pay for Wang's living expenses.

Moreover, substantial evidence supported the court's finding that, when Caritas entered into the donation agreement, it knew it was incapable of paying Wang's living expenses, demonstrating it lacked a present intent to perform that promise. As the court found, Shinemay—the CFO—testified she was aware of the church's—in the court's words—"dire financial condition." She testified that, before November 17, 2016, she knew the church "had very little money in its bank account." It was she who not only asked Wang to pay rent but also to give the church money because "money was tight" for Caritas. Wang gave the church "all [she] ha[d] at the time"—her savings of $4,000—because she "really loved Christ and . . . really loved the church." Moreover, tax records showed the church had a deficit by the end of 2016. And Caritas also borrowed $30,000 at the end of 2016 from its then-secretary Vivian Zhang. Caritas thus did not have an " '*honest* but unreasonable intent to perform,' " as it claims. (Italics added.)

The court did not err in finding Caritas falsely represented it would pay Wang's living expenses for her lifetime.

c. *Caritas's representations that it would pay the Property expenses and the costs associated with Wang's divorce*

Caritas argues substantial evidence does not support the court's finding that it falsely stated it would pay for (a) "[t]he mortgages on the house and the expenses of maintaining the

34

house"; and (b) Wang's "dissolution legal costs and other costs (such as spousal support)" because it began making payments for both right away, demonstrating the representations were true.

Although Caritas made mortgage and other Property expense payments, it added a new condition *after* Wang transferred the Property—that she and/or Xu pay rent. Wang and Xu both testified they would not have signed the agreement or deed had they known they would have to pay rent to Caritas. Accordingly, we reject Caritas's contention that the evidence did not support the court's finding that it falsely stated it would pay the expenses on the Property. As for Wang's divorce expenses, Caritas acted with reckless disregard for the truth of its financial commitments to Wang, knowing it had no funds to pay for what it promised it would.

And, in any event, any error in the court's finding that those two representations were false is harmless. We would affirm the judgment based on the court's findings that Caritas falsely stated Wang and Xu could live on the Property rent-free for the rest of Wang's life, and Caritas would pay for Wang's living expenses for the rest of her life.

### 7. *Caritas's affirmative defense of unclean hands*

In its request for statement of decision, Caritas asked the trial court to explain whether it had met its burden of proof on its "defense of unclean hands attributed to . . . Wang (in particular, whether her own attorneys preparing Charles Hsu's breach of fiduciary duty-claim against Wang created Wang's injury-in-fact in this matter)." Caritas referred the court to its tentative statement of decision's note that "Wang prevailing in this action obligates her to Hsu for $150,000." The trial court addressed

35

the latter fact—stating Caritas raised the unclean hands defense based on Wang's agreement to give Hsu $150,000 if she were to prevail in this action.  The court found claimants never explained how that agreement constituted wrongful conduct.

Caritas contends the court prejudicially erred in analyzing the defense in a different context "since a proper analysis may have established a complete defense for Caritas."  We disagree. The court addressed and rejected Caritas's argument during the trial.  Caritas argues Wang's "manufacturing litigation" by "assisting Hsu in creating a back-up plan [the breach of fiduciary duty claim against Wang] to invalidate the transfer of the Property to Caritas" is a "textbook example of someone acting with unclean hands by and through their attorney."  At trial, Caritas argued Wang didn't actually have any damage, "[s]o if her [*sic*] and her husband are coordinating his damage claim to give her a damage claim, then we start veering into unclean hands, particularly if her attorneys are creating his pleading."[23]

The court confirmed with Wang's counsel that Wang wasn't seeking as an element of her damages any potential liability she might have to Hsu—including the $150,000 she would owe him if she prevailed.  The court explained unclean

_____

[23]  Caritas's attorney read the following exchange from Hsu's 2019 deposition at trial:  Q: " 'Did any attorney from the Law Office of Edward Ip draft this pleading for you?' "  A: " 'That's the attorney I knew of.' "  Q: " 'Is your testimony—' "  A: " 'Yes.' "  Q: " 'You're just confirming what I suspected the entire time which means that you filed—you were assisted in a lawsuit by petitioner's [Wang's] attorneys against petitioner.' "  Counsel argued Wang's attorney should have been automatically disqualified.

hands would "relate" if Wang were seeking, as an element of her damages, money that she would owe to Hsu, but Wang's attorney was "saying . . . that's not the case." Caritas's attorney noted Wang's pleading "identif[ied] . . . potential liability to Mr. Hsu." The court responded, "It may be in their pleading, but like all pleadings in cases, things progress. And we're talking about a damages case. . . . [T]o the extent that that once was an element of damages on their part, it is no longer an element of damages on their part."

We agree with the trial court. The doctrine of unclean hands " 'demands that a plaintiff act fairly in the matter for which he seeks a remedy.' " (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1110.) But "[n]ot all wrongful conduct constitutes unclean hands. Only if the misconduct is directly related to the cause at issue can a defendant invoke the doctrine." (*Ibid.*) " '[T]here must be a direct relationship between the misconduct and the claimed injuries.' " (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979.) Because Wang did not claim damages from her potential liability to Hsu, the doctrine of unclean hands did not apply. Accordingly, the court's failure to analyze Caritas's unclean hands defense on this ground in its statement of decision was harmless.

8.     ***The court's undue influence analysis***

Caritas contends the court impermissibly presumed the donation agreement and quitclaim deed involved undue influence because Wang never pleaded they were obtained through undue influence. Caritas thus argues the judgment must be reversed as violative of due process because it was not " 'given proper notice and an opportunity to defend' " the issue of undue influence. (Citing *McMillin v. Eare* (2021) 70 Cal.App.5th 893,

37

913 (*McMillin*).) "[W]here fraud or undue influence, or that a party has suffered injury through the abuse of confidence by another is relied upon by a party, he must plead accordingly." (*Munfrey v. Clearly* (1946) 75 Cal.App.2d 779, 785; *id*. at pp. 782, 784–786 [judgment in favor of defendants affirmed where plaintiff on appeal argued deed he executed to convey property to his attorney was presumptively invalid as a transaction between attorney and client but hadn't pleaded or tried the case on that theory].)

The court's statement of decision included an analysis of undue influence. The court never found, however, that the donation agreement and deed must be invalidated as having been obtained by undue influence. Nor do we interpret the court's decision as having done so. Rather, the court expressly found "Claimants' conduct constitutes fraud intentional misrepresentation [*sic*]," and on that ground ordered the donation agreement and quitclaim deed invalid and void. The court considered Caritas's undue influence over Wang—based on the evidence presented at trial—as further supporting its findings that Caritas intended for Wang to rely on its representations and that Wang justifiably relied on them. The court noted: "A showing of undue influence may demonstrate that Claimants knew of their influence over [Wang] at the time of their representations or that they made their representations recklessly to [Wang]"; "Supplementally, a presumption of undue influence may add further support to establish that Claimants intended to induce [Wang] or knew [Wang] was substantially certain to enter the agreement"; and "As a supplementary issue, the undue influence Claimants had over [Wang] makes it clear that she justifiably relied on their presentations."

38

Accordingly, we reject Caritas's contention that the court impermissibly considered an unpleaded issue. In any event, the court was entitled to consider the evidence before it in determining Caritas's intent and whether Wang justifiably relied on its representations. That evidence included, for example, Wang's testimony—credited by the court—that she was weak and vulnerable, depressed, and in ill physical health when Yang asked her about donating the Property during her divorce; she had known and sought guidance from Yang—her spiritual advisor whom she saw as an older brother—for years, well before he joined the Caritas church; and she loved Christ, her church, and pastors and trusted them. Yang also testified he believed Wang trusted him and Shinemay and knew she was "appreciative of God's love and . . . the prayers many, many times." Caritas also knew the Property was Wang's only asset and she had no other place to live, and didn't tell Wang of its dire financial condition or its plan to move her off the Property and to sell it.

Caritas argues it raised this issue during trial, citing to its objection—that the court overruled—to Wang's testimony about her mental and physical health issues on the ground there was no allegation that Wang was under duress or of unsound mind when she signed the donation agreement. The court never found Wang signed the agreement under duress or that she didn't comprehend what she was signing, however. Caritas also cites *McMillin* for the proposition that a court cannot sua sponte amend a pleading to conform to proof after trial. Although the court, when Caritas's attorney made the above objection, stated it could amend the complaint according to proof, it never did. In *McMillin*, the trial court sua sponte amended a constructive trust cause of action to state a cause of action for breach of fiduciary

duty in its tentative statement of decision that it adopted as its final decision over the defendant's objection.[24] (*McMillin, supra*, 70 Cal.App.5th at pp. 910, 913 [sua sponte posttrial amendment of cause of action violated defendant's right to notice where a reasonable person would not interpret the complaint as alleging a breach of fiduciary duty by defendant].) Nothing like that happened here—the court did not change or treat Wang's claim for fraudulent misrepresentation to or as one for undue influence. Again, Caritas's trial objection was not about undue influence.

Even if the court erred in making findings about the presumption of undue influence, substantial evidence—without that analysis—supported its conclusion that Caritas engaged in fraud. Accordingly, we conclude any error in considering the presumption—and it is unclear whether the court actually applied a presumption of undue influence, as it found the agreement and deed invalidated based on fraud—was harmless.

**9.** ***The matter must be remanded for further proceedings to determine if the judgment should be modified***

In obtaining rescission or cancellation of a voidable— rather than a void—contract, "the rule is that the complainant is required to do equity, as a condition to his obtaining relief, by restoring to the defendant everything of value which the plaintiff has received in the transaction. [Citations.] This rule applies although the plaintiff was induced to enter into the contract by the fraudulent representations of the defendant." (*Fleming, supra*, 189 Cal.App.2d at pp. 796–797.) The donation agreement and deed here were voidable. (See *Fallon v. Triangle*

---

[24] In contrast, Caritas did not mention the court's undue influence analysis in its objections to the tentative statement of decision.

40

*Management Services, Inc.* (1985) 169 Cal.App.3d 1103, 1106 ["If a grantor is aware that the instrument he is executing is a deed and that it will convey his title, but is induced to sign and deliver by fraudulent misrepresentations or undue influence, the deed is voidable and can be relied upon and enforced by a bona fide purchaser."].)

Caritas contends the undisputed evidence showed Caritas made payments on Wang's behalf under the donation agreement and thus the judgment must be modified to restore those payments to Caritas. As noted, the court found this issue and the issue of Wang's damages due to claimants' fraud were not addressed at trial. Evidence of the payments Caritas made was introduced at trial. Caritas would not necessarily be entitled to restoration of the entire $42,000 it claims it paid on behalf of Wang, however. The court received into evidence exhibits demonstrating Wang suffered damages that could offset some or all of the payments Caritas made, such as increased property tax bills and rent Xu paid for Wang and herself. (See *Fleming, supra,* 189 Cal.App.2d at p. 797.) Accordingly, we remand the matter to the trial court to determine whether Caritas is entitled to any payment from Wang.

## DISPOSITION

We affirm the judgment. We remand the matter, however, for the trial court to determine if Caritas is entitled to restoration of any funds it expended on Wang's behalf. If the court so finds, it shall modify the judgment accordingly. The trial court may hold further proceedings in its discretion. Angel Xiao-Ping Wang is entitled to costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, Acting P. J.

We concur:

ADAMS, J.

OCHOA, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

42